Mr. Kushner? Good morning again. Good morning, judges. Thank you. May it please the Court, my name is Jordan Kushner and I represent Muhammad Masood, the appellant in this case. And you are under the Criminal Justice Act appointment and I'll say again, as we try to say consistently, the Court appreciates your accepting the appointment. Thank you. And the issue I'm going to focus on here is that the District Court applied the wrong standard in determining that the, to impose a terrorism enhancement under the sentencing guidelines. The language is clear. In order for the terrorism enhancement to apply, it has to be a federal crime of terrorism. And one of the criteria for it to be a federal crime of terrorism is that the actions have to be calculated to influence government conduct or retaliate against the government. Now, the District Court, in its written order explaining its decision, said that, well, I was, we were missing something that just being able to, just promoting terrorism is sufficient for the enhancement to apply. And that was fundamental error and resulted in Mr. Wong's legal standard being used and Mr. Masood not having a fair determination of the application of the enhancement. The, there's a big, of course, the terrorism enhancement has drastic consequences as far as what the advisory guidelines are. I think he would have been looking at maybe 46 to 57 months under the guidelines and instead it went up to 20 years because of the application of the terrorist enhancement. And the case law is clear that just because you've been convicted of material support for terrorism, the terrorist enhancement does not automatically apply. Those are distinctions. And so there has to be some criteria that result in such a higher sentence versus, you know, that results in such a jacking up of the sentence. And the evidence that Mr. Masood was, had any kind of specific motivation just wasn't there. You know, you look at the record, Mr. Masood, it's clear Mr. Masood was seriously mentally ill. He was diagnosed by two providers, a forensic psychiatrist and a forensic psychologist with depression, with psychotic, major depression with psychotic features. The psychiatrist found that he had bipolar disorder. Both of them testified that he was suffering from these conditions at the time of the offense. He was not thinking rationally. Was his capacity ever made an issue for, in this case? Well, it's, you know, first, you know, he was declared incompetent and had to be restored to competency. So I'm not, that's not directly what I think the court is asking, but that's clearly in the record that there's no question that he, you know, suffered serious psychotic problems and he was actually found to be incompetent. And we didn't raise insanity as a defense, determined that wasn't sufficient, but advanced that was a mitigating factor both for purposes of a downward departure under the sentencing guidelines or for a downward variance. And another one of our issues, I think a very strong issue, but I only have 15 minutes, is that the court didn't meaningfully consider Mr. Masood's mental illness. He didn't consider it on many grounds that were real important. You know, one of them was, you know, what his intent would have rationally, could have reasonably been at the time of the offense and whether he could have had the specific intent that's required under this guideline provision. Another factor is that mitigating circumstance, that he wasn't himself at the time that he did it, he wasn't getting his medication, and that he was, he got, had very substantial rehabilitation after the offense, after he got committed to a treatment facility at the Bureau of Prisons and got prescribed medication. He was a different person and the two evaluators, the two psychological evaluators both said that and they said that he wasn't, that he wasn't, was no longer a threat. And so, yes, I think the confidence, the mental illness is very strongly supported in the record, you know, by the Bureau of Prisons psychologists as well as the two different people that we, that we retained as expert The Supreme Court's reasoning was just so superficial. It didn't, it just didn't deal with his intent, just said, well, if he's trying to promote terrorism, then the enhancement applies. And the problem with that kind of reasoning is that then anyone who gets convicted of material support for terrorism, I mean, because that's the essence of what the crime is, right? You're supporting a terrorist, an organization that's been declared as a terrorist organization, so by virtue of committing that offense, you're promoting terrorism. But that's in order for the enhancement to apply, you need much more than that. I thought from the briefs, and I probably didn't read them carefully enough, that the, and I'm back to your first point about when you said the trial court said just promoting is enough, so it applied the wrong standard. I thought the, was really more whether the, the evidence under the preponderance rule would, would permit the conclusion that even your view, your view of the statute, if correct, was, was satisfied. So what, what, just tell me to the, where in the record I should look to get the mistake in the standard? I think the, I think the court's order, which is basically its reasoning is in one paragraph, it's in the addendum. I can tell you the addendum page if you want. Okay. It's, it's, you know, addendum 2A, where he says a preponderance of the evidence establishes that Massoud intended to promote the federal crime of terrorism. So that's, that's what he found the preponderance of the evidence showed. He didn't find anything based on the standard we were putting forth. He was going based on the standard of promoting terrorism, which is not the standard. Now, the, you know, he relied on this case U.S. v. Awan, which he said, well, that's, he had none of the Which he argues wrong. Yeah. But, but, well, number one, it's wrong. It's not controlling. But, but, but number two, what happened in Awan is that the, that they attributed to the defendant, you know, what the, what the people who he was working with were saying, were they clearly, they expressed clearly their intent of, you know, affecting the, you know, affecting the conduct of a government. And so in that case, you know, for the, and they didn't find the terrorism enhancement applied, by the way. They just remanded it to the district court to consider under the correct standard, and the district court ended up rejecting the, imposing the same sentence anyway. So, but in that case, what the issue is, if you're dealing with people who tell you, this is our intention, and then you support them, you know, then you're responsible. It's kind of like vicarious liability. But the FBI, undercover FBI informants in this case never went into any kind of detail. They just told Mr. Massoud, you know, Mr. Massoud said, I want to provide medical care, and they say, yeah, we need you to fight. And he said, yeah, okay, I'm willing to fight too. But there was never any kind of specifics in any of the discussions about what the objectives were. Now, I just note, you know, the government cites a lot of other evidence in the record that they claim shows. Did Mr. Massoud testify at sentencing? He did not. Did he, excuse me, who, was there a defense witness? No, we did not have live witnesses at sentencing. And I think, you know, Judge, we wanted to call the psychiatrist, but Judge Magnuson told us, and unfortunately it's not in the record, it was by email, so he told us he didn't want live, didn't want the psychiatrist testifying. But anyway, we didn't have, there were not live witnesses, but there is obviously for sentencing the court can rely on, doesn't have to rely on testimony, and so there was two extensive forensic reports. There was Mr. Massoud's, you know, of course, the PSI, where Mr. Massoud explained his actions, which I don't think his explanations were ever refuted. And then he also wrote his own extensive letter to the judge explaining his situation, you know, none of which were considered by the district court in any sort of depth. So there was, there was an evidentiary basis that he said, I'm going to fight. That's what he said.  And so, and so I think, you know, so there's one case that That's what the testimony at the trial was, or maybe he testified at trial. No, he didn't have a trial. He pled guilty. Oh, he pled guilty, yeah. Yeah, he pled guilty right off the bat, and so he admitted being part of, that he was going to join a designated terrorist organization. And, you know, so that's what the district court relied on, and that's just not enough because there wasn't any kind of evidence. I understand that argument. Okay, yeah. And so, and I think, I think it's grave, you know, the problem that these guidelines were done under the assumption that, you know, that the, that people convicted of terrorism cases are basically these incorrigible criminals who are kind of programmed, and they just have to be kept out of society. And we cited a lot of data, you know, many, you know, clear, you know, respectable academic studies, you know, including one coming out of West Point, but other places as well, finding the rate of recidivism for the people involved in terrorist offenses to be very, very low. And so I think the underlying assumption of the, of this enhancement under the guidelines which was adopted before any of these studies is really problematic and should really need, should be giving the court pause about applying it so easily because, frankly, it's kind of, it's based on antiquated, unsupportive assumptions that have really been refuted. And in Mr., which, you know, again, the district court didn't deal any, with any of those issues which, you know, were briefed extensively. And, you know, Mr. Massoud's case, you know, as we discussed, he was suffering from mental illness and, you know, was now getting the right medication regimen and had strong opinions put forth there in the record that he was no longer a danger to society. And he's a citizen of Pakistan, is going to go to Pakistan whenever he gets out of prison. So he took responsibility for his offense. You just, he just, it was completely unjustified for him to get the kind of sentence he did. There were mitigating factors and the evidence showed that this was not, this was not within his character and it was a product of mental illness that could be treated. And I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Mr. Genrich. May it please the court, counsel. Assistant U.S. Attorney David Genrich for the government. Good morning, Your Honors. I will primarily focus on the legal issues surrounding the terrorism enhancement as the defendant's counsel did. But I'm, of course, happy to answer any questions the court may have on the sentencing. You can't speak up or move the mic or something for me. On the sentencing issues as well. You can raise the platform too. Is that better? So far. Okay. Thank you. With respect to the legal standards on Section 3A.1.4, I'd first like to just review what the government believes is the appropriate legal framework and then discuss why Judge Magnuson committed no clear error in his factual findings and no legal error in concluding that the enhancement applied to Mr. Massoud. With respect to the legal framework, as the court knows, 3A.1.4 provides that the adjustment applies under one of two circumstances. First, if a defendant's conduct involved a federal crime of terrorism. Involved a federal crime of terrorism. The second part is or the defendant intended to promote a federal crime of terrorism. And what the Awan case discusses and what you see clearly in Judge Magnuson's order is that those two separate prongs of 3A.1.4 require different things. This court, from my reading, has addressed 3A.1.4 in two decisions. Ali and Mohammed. And both of those decisions addressed with the involved a federal crime of terrorism prong. And as the government noted in its brief, the district court appropriately decided that both prongs apply. And as I'll discuss in a moment, that's well supported by the record. But I'd like to talk for a moment about the intend to promote prong and Awan. Awan was cited favorably by this court in Ali and Mohammed. But this court has not, I believe, had an opportunity to apply the intended to promote prong of 3A.1.4. What does Awan say and why is it persuasive? What Awan says is that when you apply the involved a federal crime of terrorism prong, the first piece, it must involve defendant's own criminal conduct. The defendant's offense must have involved a federal crime of terrorism. What Awan says is the intend to promote a federal crime of terrorism must necessarily mean something different, just as a matter of textual interpretation, because they're posited in the alternative in the guideline. And for the intend to promote prong, the legal standard is whether the defendant's intended to promote a federal crime of terrorism that may have been intended to be committed by someone else. And it's someone else's calculation to influence government conduct that is therefore relevant for the second prong. What Judge Magnuson, if you review Judge Magnuson's order through that lens, it makes perfect sense and it was an appropriate application of legal principles. In citing Awan, what Judge Magnuson noted and quoted was that so long as the defendant's offense was intended to encourage further or bring about a federal crime of terrorism as statutorily defined, the defendant himself need not have committed an offense listed in 2332B, and the defendant's offense need not itself be calculated as described in 2332B. In other words, if a defendant's intending to promote a federal crime of terrorism committed by another, his own offense conduct does not have to be calculated to influence government. As this Court knows, the calculated to influence government sort of sub-requirement is embedded in the statutory definition of federal. But that doesn't address the intent argument. I mean, you're off on another case than what I thought we were dealing with here. It addresses the intent argument in the government's view in this way, Your Honor. With respect to involved a federal crime of terrorism, the government has to demonstrate that the defendant's offense was calculated, this is the specific intent language, calculated to influence a government, government conduct. And that's what Judge Magnuson found. Okay, let's read. If we read calculated as saying intent, what was that here? Yes, Your Honor. With respect to the factual basis on intent. I'm not sure that counsel are disagreeing on the standard here. Well, everybody's trying to find an issue of law when we're really applying, or isn't that what's happening? You're arguing over a phantom issue of law because, frankly, the burden of proof is in your favor if it's preponderance of the evidence. Your Honor, it's the government's. That's what you ought to be arguing. It's the government's position that the defendant is conflating the two intent standards under 3A1.4, which are different depending on whether the offense involved in federal crime of terrorism were intended to promote. But I'm going to move off that, Your Honor, and I'm happy to discuss. The trouble with 3A1.4 and the two intent requirements and so forth is all the incorporations of my reference in the application notes. Yes. We haven't said those are gospel. They have to be interpreted and applied, of course. Yes. I don't see this clear bifurcation in the guideline itself. Your Honor, the reasoning of a one, and I think the language of the guideline that indicates in the alternative that the adjustment applies if the offense involved a federal crime of terrorism or was intended to promote a federal crime of terrorism, creates sort of the two prongs. The statutory definitions come in because the guideline references a federal crime of terrorism, and that is defined by statute. 2332 defines, quote, a federal crime of terrorism, close quote. What a federal crime of terrorism is defined to include is conduct that is calculated to influence government conduct, essentially. And, Your Honor, I would like to turn to the factual basis for application of the adjustment under either prong here. And if this Court decides the same specific intent requirement applies to both prongs, that specific intent requirement, namely that defendant's conduct was calculated to influence government conduct, defendant's offense was calculated to influence government conduct, is satisfied here. And what I'd like to start with first is just note that the District Court did adopt the facts set forth in the PSR. Although the District Court's order lists some specific factual findings that I'll reference in a moment, at the Statement of Reasons, RDoC 128, at page 1, Judge Magnuson indicated the Court adopts the findings in the PSR. And at page 3, based on the facts set forth in the PSR and those noted above, the Court has determined the appropriate guidelines range. I say that just to note, as the government noted in its brief, that there are a number of PSR-related facts that support the application here, not just those cited in the District Court's order. So the record fully supports the order, both in writing and with respect to the PSR findings. What did Judge Magnuson find? He found that Massoud attempted to join ISIS knowing it was a terrorist organization. Mr. Kushner claims that Judge Magnuson merely required that there be material support, and that's not true. Material support, of course, can take many forms. A defendant can provide material support by providing financial assistance from the United States, for example. What Judge Magnuson found here is that this defendant's offense conduct, the manner in which he wanted to provide material support, was to join ISIS, not provide financial benefit, not set up a website, like in some of the cases cited by defendant. He wanted to join the organization, and as Judge Loken noted, he wanted to fight on its behalf. Those findings are more than supported in the PSR. As Mr. Kushner indicated in his argument, it's not disputed that he said he wanted to fight for ISIS. Judge Magnuson also found that the defendant wanted to develop drones for attack purposes in the Middle East, that he considered committing lone wolf attacks in the United States, which he referred to as attacks behind enemy lines. Why is the enemy line portion of that important? Because it demonstrates that the defendant understood that one of his enemies was the United States, and that when he sought to travel to Syria, where he said the Kufar's arrows, including the U.S. and, of course, its NATO allies, were pointed, he decided that rather than attack the United States from within, which he noted he might later regret doing because he had an opportunity that his ISIS brothers didn't, who were abroad, he decided that he was uniquely suited for the battlefield, and, in fact, that his version of Islam required him to take up arms and to travel to Syria and be on the front lines. These are facts that are in the PSR, and they were not objected to by the defendant below, and they were adopted by Judge Magnuson. If the Court reviews the addendum to the PSR with respect to defendant's actual objections, it will see a number of clarifications or additions that defendant wished to make. None of them call into question that he intended to join ISIS, travel to Syria, and take up arms. None of them call into question, as the PSR notes, that he viewed the United States as the enemy, that he offered to be killed and to kill for ISIS, and that he packed combat gear for purposes of travel to Syria. The defendant claims, well, it also had medical purposes. It might also have been used for medical purposes, but it certainly was a reasonable inference by the preponderance of the evidence that Judge Magnuson drew that in packing this tactical gear, in addition to the other facts, that he intended, indeed, to fight for ISIS. The PSR, those are the sort of five factual areas that Judge Magnuson explores explicitly in this order, but the PSR, which, again, the Court adopted, indicates that the defendant wanted to fight ISIS to support efforts to establish a caliphate in the Middle East. The defendant argued in his brief, and again here today, that Masoud wanted to fight for some unspecified reason. The record, that claim, frankly, strains credulity when one looks at the record. Defendant had a specified reason. It was to go and assist ISIS in establishing a caliphate. A caliphate, by definition, is calculated to influence or affect government conduct. I'm hoping you're going to spend some time on the argument that the District Court did not pay attention, give significant weight to this evidence of mental health issues, which is transparently obvious from the facts that you've been reciting. I mean, this was a nut case. And was that sufficiently taken into account? It was, Your Honor, in a number of ways. First of all, when the defendant entered his plea, and every time after the plea, the defendant has never claimed that his mental condition at the time he was making these statements and making sophisticated travel arrangements to Syria. I don't care what he claimed. It was argued at sentencing, wasn't it? Yes. But with respect to Just from the facts. Right. With respect Objective view of his conduct and his statements and his mental history and his post-custody treatment and rehabilitation. Was that all? I know Judge Magnuson considered it. Did he consider it sufficiently? Yes. And to focus squarely on sentencing, Your Honor, he considered it in a number of ways. First of all, the defendant brought a motion for a downward departure under the guidelines for diminished mental capacity based on mental illness. And as the court indicated in writing in its order, it found that the conditions, the mental illness conditions or mental capacity issues did not defeat culpability in this case. And those issues are, of course, intertwined with respect to a downward departure. What Judge Magnuson Then you go to variance.  So, and that's the second way in which he considered it, Your Honor. He considered it in writing with respect to the downward departure. With respect to variance, first of all, whether he considered it, as the court noted, is not in question. It was a subject of PSR submissions and oral argument. And what Judge Magnuson said with respect to explanation of a sentence was that mental illness is a serious issue. It's one that can affect defendants differently. That in some instances, it is a material fact with respect to the conduct and mitigating factors. And in some instances, defendants use it as a crutch. In this case, he indicated he was varying downward in part because of the mental illness considerations, which, again, he considered fully not only with respect to the downward departure, but in his explicit written explanation of sentence with respect to why he was varying downward in the case from 240 months to 216 months. He weighed those mitigating factors, including mental illness, against the aggravating factors in this case, of course, under 3553A. And he made a reasoned judgment in assigning weight to those factors to give defendant a substantial downward departure from 240 months, which was a capped guidelines range and was the government's recommendation, to 216 months. This Court's law, as you all know, as your honors know, is clear that it's virtually inconceivable that a district court abuses its discretion by not varying downward still further. This record is extensive. Judge Magnuson, an experienced district court judge, had a thorough PSR, multiple rounds of briefing by the parties, the results of the competency proceedings, and fulsome oral arguments and submissions on mitigation at sentencing. I see my time is up, your honors. Absent any further questions from the Court, I'd otherwise rest on the briefs. Thank you. Thank you. So, Mr. Genwich has stated a decision that the district court didn't make. The district court, in the sentencing transcript, had one sentence to discuss mental illness. It just mentioned mental illness in its written order. The statement of reasons counts, though. The statement of reasons, yeah, it counts. It counts a lot. I think what's significant is what he's pronounced in his, you know, when he made the decision at the, you know, prior to sentencing. You know, the written order that he wrote prior to sentencing, where he decided the issues before we even had a chance to argue them, and in the transcript. I think the statement of reasons are post hoc, and frankly, I didn't, they weren't cited in the government, I don't believe they were cited in the government's brief, and I didn't cite them, so I'd have to go back and look at them. So I'm looking at the record of what the judge actually said before it was sentenced. He did the sentencing, and he summarily mentioned the mental illness in his written order, and he had like one sentence, one or two sentences devoted to it in his sentencing transcript. He did not have any explanation as to why he rejected it as a significant mitigating factor. He said mental illness is real, and a lot of people use it as a crutch. The only reasonable implication being is that Mr. Massoud was using mental illness as a crutch, but as the court pointed out, there's just so much evidence that this mental illness on Mr. Massoud's part was real. This wasn't the case of saying, you know, I had a really bad childhood, I had trauma, and then they have a psychologist who comes and, you know, argues that the, you know, that they were affected by mental illness. You know, not that that would be illegitimate, but, I mean, this isn't really even up for debate, that the mental illness affected Mr. Massoud's actions. It's not disputed any place in the record, and it's replete with, you know, with psychologists and psychiatrists explaining it. And so when we saw this, I think this would be the exceptional case where the district court really did not take a very significant factor adequately into account. He just dismissed it. And he didn't, and it's also clear in the sentencing transcript that that wasn't the basis for the downward variance. He was clear that the basis for the downward variance was the hard time, that Mr. Massoud was, you know, in pretrial custody for three years during COVID, and he made good out of it. You know, he went through a lot of programming, rebuilt himself, so that was the basis for the two-year downward variance. There was no mention about mental illness being the basis. And so I think that in this case, given all the evidence in the record, the district court was obligated to explain why the mental illness wouldn't be grounds for downward variance. Now let me just in my one minute move to what the standards are for the terrorism enhancement. So the court addendum at 2A says, but 3A1.4 applies if Massoud's offense was intended to promote terrorism, not only if it was calculated to influence or affect the conduct of government by intimidation or coercion, and then cite so on. And whether there was calculation, is it necessary? And under the guidelines, it clearly is necessary. And Awan didn't reject that, didn't stand for the point. This quote is taken out of context, and Awan, the point was that whatever was in the defendant's mind, that record was clear that the people he was working with had that intent, that they might have had that intent, and if they had the intent, then the enhancement would apply. And in this case, you have these undercover FBI informants who never say anything about it. The more relevant issue, it seems to me, in the interpreting, these cross-references and so forth, is it limited to, is it calculated, can it only be satisfied by the defendant's personal intent, or can it be satisfied by joining ISIS, for example, who clearly have the intent? I would argue it's insufficient, because there isn't a record that Mr. Massoud understood that when he was joining ISIS. As I said, he's mentally ill, he was just talking about fighting as a religious principle, there wasn't any kind of political goals. Now we're off the law and into the facts. Yeah, and I think the facts do, obviously the facts matter, but yeah, so I don't think joining ISIS automatically means that the terrorism enhancement applies. There has to be evidence. I'd agree with you on automatic, but it can be sufficient evidence that you're knowingly joining a group that obviously has the intent to influence and negatively affect other governments. I think with, you know, maybe with you and me, but I think we have to look at what the evidence is in the record that applies to this defendant. I agree. And then the people he was working with in the FBI agents or under informants never stated anything about political goals, never discussed that with Massoud. So Mr. Massoud was trying to use his medical skills and fulfill some kind of deluded, frankly deluded religious principles. He never got to the point of trying to influence the government, and the undercover informants got him to agree that he was going to fight, which was enough to get him liable for material support, but they never had him agree on any kind of goals, any kind of political goals, which meant that what they got him to convince him to agree to wasn't sufficient for the terrorism enhancement. Thank you very much. Thank you, Counsel. Jay says interesting background and issues, and it's been well briefed, and the argument's been helpful, and we'll take it under advisement.